**UNITED STATES of America,
Plaintiff,**

v.

**W.R. GRACE & CO.-CONN. and
Kootenai Development Corporation, Defendants.**

**No. CV 01–72–M–DWM.**

United States District Court,
D. Montana,
Missoula Division.

Dec. 19, 2002.

See also, 280 F.Supp.2d 1149, 2003 WL 22076581.

Sherry S. Matteucci, Victoria L. Francis, Office of U.S. Attorney, Billings, MT, Matthew D. Cohn, Andrea Madigan, David F. Askman, James D. Freeman, Heidi Kukis, Mark C. Elmer, U.S. Dept. of Justice, Denver, CO, John C. Cruden, U.S. Environmental Enforcement Section, Thomas Sansonetti, U.S. Dept. of Justice, Washington, DC, for United States.

Kenneth W. Lund, John D. McCarthy, Linnea Brown, Holme, Roberts & Owen, Denver, CO, Gary L. Graham, Dean A. Hoistad, David C, Berkoff, Terry J. MacDonald, Garlington, Lohn & Robinson, PLLP, Missoula, MT, for Defendants.

## ORDER

MOLLOY, Chief Judge.

### I. Factual Background

In the late 1800s, gold miners discovered a significant body of vermiculite ore in an area located in the mountains seven miles northeast of Libby, Montana. One of the minerals found in the vermiculite deposits is tremolite, a form of asbestos in the amphibole family. Around 1939, the Zonolite Company (originally known as Universal Zonolite Insulation Company) was formed to mine and process vermiculite from the Libby ore deposit into insulating materials and other products. Under an Agreement and Plan of Reorganization dated January 17, 1963, between W.R. Grace & Co., a Connecticut corporation,

and Zonolite Company ("Zonolite Agreement"), W.R. Grace & Co. acquired "substantially all of the properties and assets of Zonolite" and agreed to

> assume and agree in due course to pay and discharge all debts and liabilities of Zonolite existing on the Closing, whether absolute, contingent or otherwise, and whether or not set forth on, reserved against or reflected in Zonolite's Balance Sheet as of December 31, 1962 ....

In 1988, W.R. Grace & Co. changed its name to W.R. Grace & Co.-Conn. as part of a complex corporate reorganization, and became a subsidiary of a newly-created New York corporation named W.R. Grace & Co. ("Grace").[1] Grace continued commercial mining and processing operations around Libby until about 1990. From 1963 to 1990, asbestos fibers were emitted from the mill at the vermiculite mine. At various times between 1963 and 1990, Grace gave away vermiculite concentrate and/or expanded vermiculite to residents of Libby.

In the mid–1990s, Grace sold several of the properties associated with its former vermiculite operations around Libby. In separate transactions in 1994, Defendant Kootenai Development Corporation ("KDC") purchased approximately 3,600 acres of mountainous land that includes the former vermiculite mine (the "Mine Site") and an approximately 20–acre parcel known as the "Kootenai Flyway" located between Highway 37 and the Kootenai River, part of a former vermiculite processing facility known as the "Screening Plant." In 2000, KDC acquired an approximately 42–acre parcel, known as the "Kootenai Bluffs," situated on the bank of

the Kootenai River, also formerly part of the Screening Plant. KDC owns the Mine Site, Kootenai Bluffs and Kootenai Flyway. A portion of the former Screening Plant is owned by Mel and Lerah Parker who, beginning around 1994, used the property for commercial operations and their personal residence.[2]

In November 1999, the EPA began a series of investigations around Libby. In spring 2000, the EPA determined that a removal action was necessary to address the releases or threatened releases of asbestos at the Screening Plant and another former vermiculite processing facility in Libby know as the "Export Plant." On May 23, 2000, the EPA issued its original Action Memorandum in which it approved a removal action for the Export Plant and the Screening Plant. The original Action Memorandum also approved an exemption from the $2 million/12–month statutory limits on removal actions.

On July 20, 2001, the EPA issued an Action Memorandum Amendment in which it modified the scope of the removal action to include several additional properties and approved an increase in the cost ceiling above $6 million to a total of $20,976,000. Among the properties added were the Brownlee and Seifkie residences, Plummer Elementary School, Libby Middle School, Libby High School, Rainy Creek Road, and similarly situated properties.

On May 2, 2002, the EPA issued a second Action Memorandum Amendment which again expanded the scope of the removal action and approved a cost ceiling increase to $55,635,000. This amendment resulted from "newly identified exposure

---

1. In this Order, "Grace" refers to W.R. Grace & Co., a Connecticut corporation, both before and after it changed its name to W.R. Grace & Co.-Conn. Defendant W.R. Grace. & Co. is a Delaware corporation that was incorporated in 1998 and is the sole shareholder of

Grace–Conn. The parties have stipulated to the dismissal of the Delaware corporation.

2. The entire area is referred to as the "Libby Asbestos Site."

pathways" and approved the removal of vermiculite insulation from businesses and residences. This approval was based in part on "the highly unusual facts indicating that homes in Libby contain insulation that consists of the asbestos-containing vermiculite mined at Libby that was not inspected, packaged, labeled, warranted, regulated or sold as a commercial product."

The United States filed this action seeking costs it incurred at the Libby Asbestos Site through December 31, 2001, in the amount of $55,166,026.56; prejudgment interest that has accrued since May 23, 2000; and a declaratory judgment on the liability of Grace and KDC for response costs or damages that will be binding in any subsequent action or actions to recover further response costs or damages.[3]

In general, Defendants maintain that the EPA's response actions and the costs incurred are inconsistent with the National Contingency Plan ("NCP"), 40 C.F.R. Part 300; the EPA has not accurately accounted for its costs as required by 40 C.F.R.

§ 300.160; the EPA's response actions included responses to a release or threatened release of "a naturally occurring substance in its unaltered form, or altered solely through naturally occurring processes or phenomena, from a location where it is naturally found" or "from products which are a part of the structure of, and result in exposure within, residential buildings or business or community structures" as proscribed by Section 104(a)(3) of CERCLA, 42 U.S.C. § 9604(a)(3); and the releases or threatened releases of asbestos in Libby, Montana were caused by an act of God, act of war, or act or omission of a third party other than an employee or agent of the Defendants, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the Defendants.

The parties have stipulated that: (1) asbestos is a hazardous substance as defined in Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (2) Libby vermiculite ore deposits contain measurable quantities of asbestos; (3) there has been a release

---

**3.** Specifically, as set forth in the Final Pretrial Order, the United States seeks a declaratory judgment that Grace is liable for response costs and costs of public health assessments or health effects studies incurred after December 31, 2001(1) at the Mine, Screening Plant, Export Plant, Flyway, Bluffs, Libby Middle School, the Plummer Elementary School, and the Calhoun, Burriss, Johnson, Sanderson (123 Hamann Ave.), Temple, Struck, Rice, Fuhlendorf, Spencer, Westfall, Hoff, Beauliea, Burshia, Schenck, Sanderson (4241 Hwy 37 N), Skramstead, Cady, Cote, Hebenstreit, McCully, Hilliard, Parseau, Jeresek, Dennis, Long, Belangie, Wilkes, Rodgers, Parker (1421 Main St.), Drury, Graham, Bowker, Phillips, Jacobson, Visger, Brown (653 Flower Creek Road), Brown (346 Granite Ave), Downey, Geer, Jordan, Mohr, Nixon, Ray, Sanderson (113 W. Oak St.), Wilkes, Powers (2293 Kootenai River Rd.), Powers (2297 Kootenai River Road), Kootenai Angler, Epperson and subsequently identified properties within the Libby Asbestos Site at which detectable amounts of amphibole asbestos ex-

ist in the yards, gardens or driveways of residential or commercial properties in Libby; (2) at properties within the Libby Asbestos Site that have detectable amounts of amphibole asbestos in household dust, including but not limited to the Spencer Law Firm, Kootenai Valley Christian School, Achievements Shop, and the Fryberger, Loomis, Peterson, Alford, McBride, Smith, Spencer, Norres and Stubbs properties; (3) and at other properties within the Libby Asbestos Site at which EPA undertakes or has undertaken sampling activities or has otherwise investigated the possible presence of amphibole asbestos (with the exception of the Foote, Walker, and 1022 California Avenue properties). The requested declaratory judgment relates only to Grace's liability with respect to the above-identified properties, not the amount of costs incurred or the NCP consistency of any future response action decisions. The United States also seeks a declaratory judgment that KDC is liable for response costs incurred after December 31, 2001 at the Flyway. Bluffs, and Mine.

or threatened release of asbestos at the Libby Mine Site, Screening Plant (including the Flyway and Bluffs), and Export Plant; and (4) these sites are "facilities" as defined in Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

## II. Analysis

### A. Applicable Law

CERCLA provides that

[w]henever (A) any hazardous substance is released or there is a substantial threat of such a release into the environment, or (B) there is a release or substantial threat of release into the environment of any pollutant or contaminant which may present an imminent and substantial danger to the public health or welfare, the president is authorized to act, consistent with the national contingency plan, to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance, pollutant, or contaminant at any time (including its removal from any contaminated natural resource), or take any other response measure consistent with the national contingency plan which the President deems necessary to protect the public health or welfare or the environment.

42 U.S.C. § 9604(a)(1).

The ability to respond to a release or threatened release is limited when the response is to that

(A) of a naturally occurring substance in its unaltered form, or altered solely through naturally occurring processes or phenomena, from a location where it is naturally found;

(B) from products which are part of the structure of, and result in exposure within, residential buildings or business or community structures; or

(C) into public or private drinking water supplies due to deterioration of the system through ordinary use.

42 U.S.C. § 9604(a)(3). However, even in the situations listed in § 9604(a)(3), a response is permitted if, in the agency's discretion, it determines that the release or threatened release "constitutes a public health or environmental emergency and no other person with the authority and capability to respond to the emergency will do so in a timely manner." 42 U.S.C. § 9604(a)(4).

As set forth in CERCLA, and more defined in the regulations promulgated thereunder, two different response actions to a release or threatened release of a hazardous substance are permitted: a removal[4] action or a remedial[5] action. If the agency determines that a release or threatened release is a threat to the public health or welfare, the agency "may take any appropriate removal action to abate, prevent, minimize, stabilize, mitigate, or eliminate the release or the threat of re-

---

4. "Remove" or "removal" are defined as "the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary [sic] taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release." 42 U.S.C. § 9601(23).

5. "Remedy" or "remedial action" are defined as "those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment." 42 U.S.C. § 9601(24).

lease." 40 C.F.R. § 300.415(b)(1). To proceed with a removal action, the agency must first consider the following factors (the "mandatory factors"):

> (I) Actual or potential exposure to nearby human populations, animals, or the food chain from hazardous substances or pollutants or contaminants;
>
> (ii) Actual or potential contamination of drinking water supplies or sensitive ecosystems;
>
> (iii) Hazardous substances or pollutants or contaminants in drums, barrels, tanks, or other bulk storage containers, that may pose a threat of release;
>
> (iv) High levels of hazardous substances or pollutants or contaminants in soils largely at or near the surface that may migrate;
>
> (v) Weather conditions that may cause hazardous substances or pollutants or contaminants to migrate or be released;
>
> (vi) Threat of fire or explosion;
>
> (vii) The availability of other appropriate federal or state response mechanisms to respond to the release; and
>
> (viii) Other situations or factors that may pose threats to public health or welfare of the United States or the environment.

40 C.F.R. § 300.415(b)(2). If it is determined that removal is appropriate, the action must begin as soon as possible. 40 C.F.R. § 300.415(b)(3). However, if a removal action is selected and there are six months between the time the decision is made and the time on-site activities are to begin, the agency must conduct an engineering evaluation/cost analysis[6] and develop sampling and analysis plans, if environmental samples are to be used. 40 C.F.R. § 300.415(b)(4).

## B. Motions Regarding Grace

The United States has filed three separate motions for summary judgment regarding its claims against Grace. The motions are parsed by claims and defenses, however, there are three over-arching issues that transcend the different motions. The three issues that must be decided are:

> (1) Was the EPA's decision to conduct and continue its asbestos removal action at the Libby Asbestos Site arbitrary and capricious?
>
> (2) Is Grace liable under CERCLA for cleanup at the Libby Asbestos Site?
>
> (3) Is the EPA entitled to the $55,166,026.56 in costs it claims have incurred as part of the removal action?

## 1. Removal Action Consistent with NCP

■ The EPA contends that its decision to conduct a removal action complies with CERCLA and the NCP. Grace counters that the EPA should have conducted a remedial action and that its decision to undertake a removal action was designed to avoid the safeguards necessary to proceed with a remedial action. Additionally, Grace contends that the EPA has violated the NCP because the response action has exceeded the $2 million/12–month statutory limits without justification.

The EPA's first Action Memorandum summarizes the factors it considered in approving a time-critical removal action and exemption from the $2 million/12–month statutory limits. In its initial investigation, the EPA found over 200 reported cases of asbestos-related diseases, including 33 that were non-occupational and 6 in which there were no family ties to the vermiculite mine. The EPA also found a significant amount of asbestos-contaminated vermiculite at the Libby Asbestos Site, including in houses, areas where children played, and gardens. Historical and recent samples by Grace and the EPA

---

**6.** An EE/CA "is an analysis of removal alternatives for a site."

showed excessive concentrations of airborne asbestos were common.

Based in part on these findings, the EPA concluded that the conditions around Libby constituted an imminent and substantial threat to the public health and welfare. In recommending and approving a removal action, the Action Memorandum contained specific findings that there was actual or potential asbestos exposure to human populations; numerous piles of bulk asbestos-contaminated vermiculite existed at the Libby Asbestos Site; contaminated soils at the Site were likely to be spread by wind, rain, snow-melt, and removal by humans; and that no other viable federal or state response actions were likely. These findings correspond to the mandatory factors set forth in 40 C.F.R. § 300.415(b)(2)(i), (iii), (iv), (v), and (vii) and are supported by the record that was before the EPA.

While the Action Memorandum does not contain specific findings on the factors in subparts (b)(2)(ii), (vi) or (viii), the record indicates they were considered. For example, (b)(1)(ii) requires consideration of "[a]ctual or potential contamination of drinking water supplies or sensitive ecosystems." The Action Memorandum indicates that it was too early to determine if asbestos contamination posed a threat to the environment, but evaluation would continue;[7] likewise, it appears the asbestos-contaminated vermiculite posed no risk of fire or explosion. Though subpart (b)(2)(viii) was not specifically considered, it is a catch-all provision that allows consideration of any other factors not already considered.

Grace's main argument is that the EPA has acted arbitrarily and capriciously because it is performing a remedial action under the guise of a removal action, allowing it to evade procedural safeguards. As noted above, however, the record indicates that the EPA considered the mandatory factors set forth in 40 C.F.R. § 300.415(b)(2). The NCP allows the EPA to proceed with a removal action after considering these factors. That the response could also be classified as a remedial action is not relevant. Consideration of the mandatory factors is what is required to conduct a removal action; because the EPA did so, its decision to conduct a removal action rather than a remedial action is consistent with the NCP and cannot be second-guessed by this Court. *See e.g. United States v. Chapman*, 146 F.3d 1166, 1172–73 (9th Cir.1998).

■ Likewise, the EPA's decision to undertake a time-critical removal was not arbitrary and capricious. The NCP requires that the EPA perform an engineering evaluation/cost analysis if a planning period of six months exists before a removal action is to begin, 40 C.F.R. § 300.415(b)(4)(i). Here, the EPA issued its Action Memorandum on May 23, 2000 determining that a removal action was appropriate and that it should be deemed time-critical due to the immediacy of the potential harm to people in Libby.

In reaching this decision, the EPA determined that asbestos contamination posed an immediate threat to people in Libby and that the short construction season required immediate action to avoid substantial delay. The EPA began its removal action by July 2000, within six months of its decision. While Grace disagrees with the EPA's decision to pursue a time-critical removal, it is a decision that is within the EPA's discretion. Because the removal action began within six months, the NCP did not require the EPA to per-

---

7. The Action Memorandum also indicated that a response action would mitigate any threat to the environment.

form an engineering evaluation/cost assessment.

■ Grace also argues that the removal action is not legal because the EPA has exceeded the $2 million/12–month statutory limits for removal actions. Grace is correct that CERCLA and the NCP establishes limits on removal actions, however, those limits are not inviolate. Rather, the limits apply unless the EPA determines that

(i) [t]here is an immediate risk to public health or welfare of the United States or the environment; continued response actions are immediately required to prevent, limit, or mitigate an emergency; and such assistance will not otherwise be provided on a timely basis; or

(ii) [c]ontinued response action is otherwise appropriate and consistent with the remedial action to be taken.

40 C.F.R. § 300.415(b)(5).

The EPA documented its reasons for exemption from the statutory limits in the original Action Memorandum and each subsequent Action Memorandum Amendment. Specifically, the EPA determined that the public's continued exposure to asbestos in the environment around Libby constituted an immediate risk to the public health; without continued immediate response, asbestos would continue to expose the public to harm; the statutory time and monetary limits were insufficient for an appropriate response due to the size and complexity of the removal; and no other entity had the resources to take similar actions. The EPA's consideration of these factors satisfies the requirements in the NCP and allows the EPA to exceed the statutory limits on removal actions.

■ Finally, Grace argues the EPA violated its own policies in approving the removal action, declaring it time-critical, and exceeding the statutory cap. Regardless of whether this is true, it is not relevant. CERCLA and the NCP, not the internal policies of the EPA, govern the decisions surrounding removal actions. The NCP does not incorporate the EPA's internal policies; accordingly, the EPA's alleged failure to comply with its own policies does not violate the NCP, nor can it be a basis for finding the EPA's actions arbitrary and capricious. *United States v. Findett Corp.*, 220 F.3d 842, 849–50 (8th Cir.2000).

The EPA has complied with the NCP's requirements to approve a time-critical removal action and to exceed the $2 million/12–month statutory limits. Because the EPA considered the factors set forth in the NCP, the Court cannot second-guess its conclusions. Therefore, the EPA's actions are not inconsistent with the NCP, nor are they arbitrary and capricious or otherwise not in accordance with law.

### 2. Grace's Liability Under CERCLA

■ To establish a prima facie case to recover response costs under CERCLA, the EPA must prove: (1) the site is a facility; (2) a release or threatened release of a hazardous substance occurred; (3) the government incurred costs in responding to the release or threatened release; and (4) the defendant is the liable party. 42 U.S.C. § 9607(a); *Chapman,* 146 F.3d 1166, 1169 (9th Cir.1998). Once the United States establishes a prima facie case, the burden shifts to the defendant to prove that the response action was inconsistent with the national contingency plan ("NCP"). *Id.* In a recovery of response costs action, consistency with the NCP is presumed. *Id.* at 1170; *United States v. Chromalloy American Corp.,* 158 F.3d 345, 352 (5th Cir.1998) ("as long as the government's choice of response is consistent with the NCP, costs are presumed to be recoverable"). To rebut the presumption, the defendant must show that the response

action itself, rather than individual costs, was inconsistent with the NCP. *Chapman,* 146 F.3d at 1170–71; *United States v. Hardage,* 982 F.2d 1436, 1443 (10th Cir. 1992).

■ The parties agree that Grace is liable under CERCLA for cleanup of the following properties (the "undisputed properties") [8]:

The Mine Site; the former Screening Plant; the Flyway; the Bluffs; the Export Plant; the Libby High School; the Libby Middle School; Plummer Elementary School; Champion Hall Road; Rainy Creek Road; and the residential properties of Belangie, Brown (635 Flower Creek), Brownlee, Burshia, Cote, Dennis, Downey, Drury, Geer, Graham, Hebenstreit, Hilliard, Hoff, Jacabson, Jeresek, Jordan, Long, Mohr, Norres, Parker, Parseau, Peterson, Phillips, Powers (2297 Kootenai River Rd.), Rice, Rodgers, Sanderson (123 Hamann), Sanderson (4241 Hwy 37), Schenck, Skramstad, Smith, Spence (500 Jay Effar), Spence (229 Pinewood), Struck, Temple, McCully, Westfall, Wilkes (461 Parmenter), Wilkes (600 Ave. B).

The parties dispute Grace is liable for cleanup of the following properties (the "disputed properties"):

Calhoun, Burriss, Johnson, Fuhlendorf, Beauliea, Cady, Hebenstreit, Bowker, Visger, Brown (346 Granite Ave), Nixon, Ray, Sanderson (113 W. Oak St.), Powers (2293 Kootenai River Rd.), Kootenai Angler, Epperson, Spencer Law Firm, Kootenai Valley Christian School, Achievements Shop, Fryberger, Loomis, Alford, McBride, and Norres.

■ For the disputed properties, there are disputed issues of material fact as to whether Grace is liable for cleanup. It is apparent that asbestos has been found at these properties, either in the soil or in the dust. While the amount of asbestos at some of the properties is small, there is no minimum requirement for a release or threat of release to have occurred. The properties qualify as facilities because they are places where "a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9). Additionally, the EPA has incurred costs in responding to the releases or threatened releases at these properties. The issue, then, is whether Grace "arranged for disposal" of a hazardous substance at the disputed properties making it a liable party under CERCLA.

Grace has agreed that it arranged for disposal of a hazardous substance at the Schools, the undisputed residential properties, Rainy Creek Road, and Champion Haul Road. This is based in part on the fact that Grace allowed people in Libby to take asbestos-contaminated vermiculite to use in their homes and gardens. While it is likely that the same occurred at the disputed properties, this is not clear based on the undisputed facts. Therefore, summary judgment on Grace's CERCLA liability for the disputed properties is not appropriate.

### 3. Response Costs

■ Because the NCP regulates choice of response actions, costs alone cannot be inconsistent with the NCP. *Hardage,* 982 F.2d at 1443. If the EPA establishes that Grace is liable under CERCLA, the sole defense to being responsible for response costs is to establish that the response action was inconsistent with the NCP. *Id.* Because the Court has determined that

---

**8.** In the Final Pretrial Order, the parties stipulated that, as to the undisputed properties, the elements in § 9607(a) apply.

the removal action is consistent with the NCP, Grace is liable for all documented costs incurred by the EPA in responding to the undisputed properties. If the United States establishes that Grace is also liable for cleanup at the disputed properties, Grace will be responsible for all costs incurred by the EPA in the removal action. Any claim that the costs are excessive or unreasonable is not a defense. *Id.*

At this stage, the EPA is seeking $55,166,026.56 for costs incurred in responding to the Libby Asbestos Site. Grace agrees the EPA has provided adequate documentation for $30,502,121.74 of those costs. However, it is not clear what costs were incurred at each property. For the EPA to recover the full amount, it must prove that Grace is liable under CERCLA for cleanup of all of the properties. Because the parties have not prorated the costs by site, it is difficult, if not impossible, to determine what costs were incurred at the undisputed sites. Therefore, summary judgment on response costs is improper at this time.[9]

## C. Motion Regarding KDC

### 1. CERCLA Liability

The United States moves for summary judgment on the liability of KDC for response costs incurred at properties owned by KDC (the "KDC properties") within the Libby Asbestos Site.[10] The United States also seeks summary judgment on KDC's third-party and act of God defenses.

The parties have stipulated that a release or threatened release of a hazardous substance occurred at the KDC properties; that the properties are facilities under 42

U.S.C. § 9601(9); and that KDC is an owner of the properties. KDC also agrees that the EPA incurred costs in responding to the release or threat of release of asbestos at the KDC properties. However, KDC argues that the United States has not proven an appropriate nexus between the costs incurred and KDC's relation to those costs. KDC also argues that the United States has not proven that the response costs were necessary, an element which KDC argues is factual in nature due to the number of parties who have owned the property in question.

KDC relies on several cases, including *Carson Harbor Village, Ltd. v. Unocal Corp.*, to support its contention that the United States must establish a "necessary nexus" to recover response costs. However, *Carson Harbor* does not support this proposition. At issue in *Carson Harbor* was the cleanup of tar-like and slag materials from contaminated wetlands. Unocal had previously used property around the wetlands in its petroleum production operations, though at the time of the cleanup, the property was used by Carson Harbor as a mobile home park. 270 F.3d 863, 868 (9th Cir.2001).

Carson Harbor sued Unocal to recover response costs it incurred in cleaning up the property. The court there determined that "genuine issues of material fact precluded summary judgment on the issue of whether the response costs at issue were 'necessary.'" *Id.* at 888. However, the dispute in *Carson Harbor* was not whether costs were necessary, but whether any response was required at all.

---

**9.** If the parties can stipulate to the amount of the undisputed $30,502,121.74 in costs that were incurred at the undisputed properties, summary judgment will be granted for that amount. For those costs that remain disputed, the only issues for trial are (1) whether Grace is liable under CERCLA for response

actions at the disputed properties, and (2) whether there is adequate documentation for the costs incurred.

**10.** KDC owned the Mine, the Bluffs, the Flyway, and portions of the Screening Plant.

Here, unlike in *Carson Harbor*, neither the United States nor KDC dispute whether the EPA has or should have responded. Rather, KDC maintains the EPA's response costs were not necessary. However, causation is not an element under CERCLA liability and any argument regarding necessity is irrelevant to liability. The United States need only establish facts showing the EPA incurred response costs. The United States need not prove that response costs the EPA incurred were caused by KDC. The United States has incurred response costs in removing 80,000 cubic yards of contaminated soil and will continue to incur costs as the cleanup continues. Thus, the United States has established that response costs were incurred, thereby establishing a prima facie case for liability under CERCLA.

### 2. Third–Party Defense

As one of its affirmative defenses, KDC asserted that

> [t]o the extent that the United States suffered any costs or damages, as may be alleged in the Complaint, these costs or damages were caused solely or at least in part by the act or omissions of third parties, for which KDC is not responsible.

The United States maintains that KDC has failed to raise a genuine issue of fact because it has not identified a responsible third-party. In response, KDC asserts that "unauthorized persons *may* have entered the properties and *may* have been responsible for releases thereon or for removal of materials that later resulted in releases" (emphasis added).

In *United States v. Poly–Carb, Inc.,* the district court held that evidence which was "likely insufficient to prove a third party affirmative defense at trial" could raise a "likelihood" sufficient to show that genuine issues of material fact exist. 951 F.Supp. 1518, 1531 (D.Nev.1996). *Poly–Carb* in-volved a caustic spill and contentions by Poly–Carb's president and police chief that they had no idea how the spill occurred. *Id.* While the court in *Poly–Carb* found that the contentions were sufficient to raise a genuine issue of fact as to third-party liability, it had before it undisputed evidence that "the release [caustic spill] may very well have been caused by vandals." *Id.* at 1530.

Here, KDC has not pointed to any evidence of third-party actions, other than its unsupported contention that a third party *may* have entered the Bluffs and the Flyway. It is KDC's burden to present evidence that a third party was the sole cause of the release and that the third party had no relationship to KDC. *Id.* at 1531. KDC's assertions are hypothetical, are unsupported in the record, are insufficient to raise a genuine issue of fact, and, therefore, are insufficient to defeat summary judgment.

### 3. Innocent Purchaser

To avail itself of the innocent purchaser defense, KDC must show that at the time it acquired the properties, it "did not know and had no reason to know that any [asbestos] was disposed of on, in, or at the facility." 42 U.S.C. § 9601(35)(A)(i). To establish that it had no reason to know, KDC must show that at the time of its purchase, it undertook "all appropriate inquiry into the previous ownership and uses of the property consistent with good commercial or customary practice...." 42 U.S.C. § 9601(35)(B).

KDC does not point to facts that tend to establish that it was an innocent purchaser. KDC states only that at the time it purchased the KDC properties, there was no active mining or vermiculite processing and that it was not aware of the presence of asbestos on the property. KDC does not point to facts that show it made any

inquiry into the previous ownership and uses of the property, let alone "all appropriate inquiry." KDC has failed to point to articulable, material facts that show there is a genuine issue for trial.

#### 4. Act of God

An act of God is defined as a "natural phenomenon of an exceptional, inevitable, and irresistible character, the effects of which could not have been prevented or avoided by the exercise of due care or foresight." 42 U.S.C. § 9601(1). KDC maintains that naturally-occurring vermiculite and asbestos minerals underlie several portions of the KDC properties and that EPA's removal efforts on the Kootenai Flyway and the Bluffs have disturbed this naturally-occurring vermiculite and asbestos, resulting in a release not attributable to KDC.

KDC's act of God defense alleges that the vermiculite and asbestos were naturally-occurring and were released as a result of the EPA's actions. That vermiculite and asbestos are naturally-occurring at the Libby Asbestos Site is not a "natural phenomenon of an exceptional, inevitable, and irresistible character" and, therefore, is not an appropriate Act of God defense. Further, the record before the Court establishes that the EPA responded to asbestos and asbestos-contaminated vermiculite that was a by-product of vermiculite processing. This does not qualify as "a naturally occurring substance in its unaltered form, or altered solely through naturally occurring processes or phenomena." 42 U.S.C. § 9604(a)(3)(i). Therefore, KDC has failed to point to material facts that it is entitled to assert an act of God or naturally-occurring substance defense.

### III. Conclusion

Based on the analysis above, the Court finds:

1. The EPA's removal action at the Libby Site was not arbitrary and capricious and, therefore not inconsistent with the NCP.

2. Grace is liable under CERCLA for cleanup at the undisputed properties.

3. There are material issues of fact as to whether Grace is liable under CERCLA for cleanup at the disputed properties.

4. Because there are material issues of fact regarding the disputed properties and the requested response costs are not prorated by site, there are material issues of fact as to the amount of response costs.

5. KDC is liable under CERCLA for cleanup at the KDC properties.

Accordingly, IT IS HEREBY ORDERED that Plaintiff's Motion for Partial Summary Judgment re:

1. Liability of W.R. Grace and First and Fourth Affirmative Defenses (dkt # 86) is GRANTED in part and DENIED in part.

2. Response Costs and Second Affirmative Defense (dkt # 97) is DENIED.

3. Third Affirmative Defense (dkt # 93) is GRANTED.

4. Liability of KDC (dkt # 46) is GRANTED.